JOHN GLENN vs. WILLIAM A. McKIM AND OTHERS.—*December* 1845.

A sum of money deposited in the Court of chancery, being detained there by appeal, it was, in July 1836, agreed, that by and with the consent of the Chancellor, that *G* and *S* be constituted trustees, to receive and invest such funds; and that upon the final hearing of the appeal, the trustees should pay into the Court of chancery the said sum, and all interest and profit which might accrue thereon, subject to the order and decree which might be passed on said appeal. The money was paid to the trustees, who jointly receipted therefor, loaned *H* a part thereof, which was repaid in about twelve months, and immediately thereafter loaned the same sum to *T*, who amply secured the same by mortgage. The mortgagee paid interest thereon from time to time to *S*, *one* of the trustees; and in 1841, repaid him the entire principal sum, when he released the mortgage. All the payments to *S*, were *without* the knowledge, privity, or consent of *G*, who was also ignorant of the release. The cause, upon appeal, was decided in 1838, but no application was made for a distribution of the fund, by those entitled to it by the decree of the Chancellor and appellate court, until 1843, when a petition was filed, requiring the trustees to account. It then appeared that *S* had misapplied the fund received from *T*. There was no charge of fraud, collusion, or criminal remissness on the part of *G*. HELD: that the loan to *T*, was properly and regularly made, and that *G*, as co-trustee, was not responsible for the money received by *S* from *T*, and misapplied.

A trustee is answerable for the default of his co-trustee, if, with a knowledge, that the trust fund is in a course of abuse, that his co-trustee is making an improper use of it, he remains passive, refuses or declines to interfere.

If there be mal-practice, fraud, or evil dealing between co-trustees, then the one shall be answerable for the default of the other.

If judicial trustees are to be made responsible for the acts of each other, in cases where trustees, by agreement, would not be so, it must be by virtue of a bond, taken for the due performance of their trusts, and where one stipulates for the other.

Where there are two trustees, and one of them is in default, without the knowledge, privity, or consent of the other, the parties interested, who selected the defaulting trustee, shall not hold the other, innocent one, liable for the defaulter's acts.

Where two trustees are appointed to receive and invest money, and one of them puts it into the hands of the other to invest, instead of investing it with his associate, and the latter uses the money, both are answerable.

Where money was paid out of chancery, by agreement, to trustees, to invest and make interest pending an appeal, and the trustees, upon the determination of the appeal, were to bring the fund and interest again into court, but, in the meanwhile, other proceedings were had in the cause, which prevented the Chancellor from awarding a distribution of the fund, until

these also were disposed of, the obvious intent of the parties required, that the investment, for the sake of interest, should continue until such other proceedings were acted upon, and it was not the duty, nor the right of the trustees, to prevent the fund from yielding interest, while the court had not, from any cause, the power of distributing it.

APPEAL from the Court of Chancery.

On the 12th November 1834, *Joseph McKim* filed a bill to sell the real estate of his deceased brother, *Samuel McKim;* and on the 4th May 1835, a decree was passed for that object, and *John Scott* and *W. H Marriott*, were appointed trustees to carry it into effect. They gave separate bonds, made a sale, and deposited the proceeds of sale in court. Proceedings in attachment having been instituted by a creditor of one of the parties, distribution of a portion of the fund was delayed; and on the 22nd July 1836, the following agreement was filed in the cause :—

"On the exceptions which were filed by *Joseph McKim* and others, to the account of the trustees, stated and filed by the auditor on 23rd September 1835, by which a part of the proceeds of the sale of the said estate were allotted to *William T. Fleet, John A. Fleet,* and *Andrew Fleet,* and to *Laura M. Fisher, Margaret J. Fisher, Charles M. Fisher, Janette Fisher,* and *Elizabeth Fisher,* the Chancellor having sustained the said exceptions by his order of 28th June last, and the said *William T. Fleet* and others, above named, having been excluded by the said order from any participation in the proceeds of the said estate, and having taken an appeal from the said order, it is agreed, by and with the consent of the Chancellor, that *John Glenn* and *John Scott* of the city of *Baltimore*, be constituted trustees, to receive and invest that portion of the proceeds of the said estate, now deposited in the high court of chancery, which was allotted to the said *William T. Fleet* and others, by the said account of 23rd September last past, to wit, the sum of $8912.90, being one-fifth of the net proceeds; and the further sum of $1782.58, to which the said *Laura M. Fisher* and others, will be entitled, provided the said order of the Chancellor is reversed. And it is further agreed, that the register of the Court of chancery, by and with

the consent of the Chancellor, draw checks for the said sums of money, payable to the order of said *John Glenn* and *John Scott*. And it is further agreed, that upon the final hearing of the said appeal, the said *John Glenn* and *John Scott* shall pay into the Court of chancery the said sum of money, and all interest and profit which may accrue thereon, subject to the said order and decree which may be passed on said appeal."

"JOHN SCOTT, for complainant, and solicitor for *Alexander McKim*, *William A. McKim*, and *Guest* and *wife; and* guardian of *Joseph McKim*."

"JOHN GLENN, for *John A. Fleet* and others."

"WM. H. MARRIOTT, for *Jane Hutchinson*."

"T. PARKIN SCOTT, for *Margaret C. Fisher*."

On the 30th July 1836, there was filed in the said cause the following receipt:—

"BALTIMORE, 27*th July*, 1836.—We do hereby acknowledge to have received from *Ramsay Waters*, *Esq.; Reg. Cur. Can.*, a check on the *Farmers Bank of Maryland*, for the sum of $10,695.48, drawn by him, pursuant to the order of the Chancellor, payable to the credit of the real estate of *Samuel McKim*, deceased.                JOHN SCOTT,
$10,695.48.                                    JOHN GLENN."

On the 8th March 1843, *James Guest* and wife, *Jane Hutchinson*, *William A. McKim*, and *Margaret C. Fisher*, as heirs at law of *Samuel McKim*, filed a petition, setting forth the previous proceedings in the cause; and that upon the appeal taken, the decree of the Court of chancery had been affirmed, so that the event contemplated by the agreement, has occurred; and that the petitioners are entitled to require, that the aforesaid sum of money, ($10,695.48,) with its profits and increase, should be brought in for distribution among the parties, who had become entitled thereto by the aforesaid decree of the Court of Appeals. That the trustees are jointly responsible, and the petitioners ignorant of the profits made, and for what they might have made, and did not, by reason of their negligence. Prayer, for disclosure, and for an account, &c.

On the same day the chancellor ordered, that the trustees answer the petition.

*John Scott,* by his answer, admitted it to be true, that in the year 1836, a large sum of money was then on deposite in the Court of chancery of this State, belonging to the estate of the late *Samuel McKim,* the right to which was then in controversy between certain persons, of whom the petitioners are some, claiming to be heirs at law of the said *S. McK.,* and that under an order passed by the chancellor, the precise amount of which this defendant has not, at this time, the means of ascertaining, the said sum of money was directed to be paid to *John Glenn* and this defendant, as trustees, pending the said controversy, to be invested for the benefit of those persons who might be entitled to the said fund. That of the funds so paid, this defendant, with the consent of the said *John Glenn,* loaned on security to *John H. Hunter, Esq.,* of *Baltimore,* the sum of $5000, which was repaid as follows: $200, on the 8th May 1837, and the balance, to wit, $5101.67, on the 31st July 1837; and that this defendant then, on the 1st August, in the same year, loaned to *Luke Tiernan, Esq.,* then of the city of *Baltimore,* but since deceased, the sum of $5000, on mortgage, and that the said *Luke Tiernan, Esq.,* paid to this defendant the interest thereon, from the 1st August 1837, to the 1st August 1839, amounting to $600, and died sometime in that year, without having made any further payments on account of the said debt. That after the death of *Luke Tiernan, Alexander Niel, Esq.,* one of the executors of the will of *Luke Tiernan,* made the following payments to this defendant on account of said debt and interest, viz., on the 14th January 1840, $150; on the 6th July 1841, $150, for interest to the 1st of August next, thereafter; on the 2nd February 1841, $150, for interest to the 1st January; on the 11th February in the same year, $1000; and on the 28th May 1841, $3080, in full of said debt; and that of this sum so last paid, this defendant, on the 1st June, in the same year, paid to the *Baltimore & Ohio Railroad Company,* he being the administrator upon the personal estate of the said *Samuel McKim,* the sum of $2000, on account of instalments then

47        v.3

due upon the stock belonging to the estate of the said *Samuel McKim*. And this defendant, further answering, saith, that the controversy respecting the right to the said sum of money, was decided by the Court of Appeals, at June term 1838, on an appeal from an order of this court, taken by the *Fleets* against the heirs of said *Samuel McKim*, in which matter this defendant acted both as counsel and agent for the said heirs, and associated *Reverdy Johnson, Esq.*, with him as counsel; that he considered himself as entitled to a fee of $500, for his service, and he requested *John Glenn, Esq.*, to pay out of the fund in his hands a like fee to *Reverdy Johnson, Esq.*, which was done. This defendant further answering, saith, that in November 1837, this matter could have been settled so far as regards the said controversy, but that pending those proceedings, *Samuel G. Hyde* of the city of *Baltimore,* claiming to be a creditor of the estate of *Samuel McKim,* to an amount greater than the whole of the personal estate, had filed a bill in chancery against this defendant, as administrator as aforesaid, and subsequently a supplemental bill, and the distribution of the said funds was enjoined by your honor; to all which proceedings this defendant begs leave to refer, and prays, that the same may be taken and considered as a part of this, his answer to the said petition. And this defendant further answering, saith, that in the year 1837, being then the sole counsel of *Joseph McKim* and *Alexander McKim*, surviving brothers of *Samuel McKim*, each of whom is entitled to one-fourth of the whole estate, both real and personal, except so far as other counsel were employed by him in suits at law and in equity, and considering himself able to meet his own engagements, and being as administrator, charged in some degree with the interests of the other parties, he paid the clerk of the Court of Appeals, $19.60, his fees, on the appeal herein before mentioned; and expecting thereafter to be allowed large fees and commissions from his clients in the settlement of the said estate, and being then in want of money, in the month of November in the same year, borrowed from *John Glenn, Esq.,* $1100 out of the said funds, and the further sum of $250 on the 19th July 1835; and that actuated by

his own impressions of his authority, and then still hoping with the aid of his fees and commissions, and other resources, (in which he has been disappointed,) to be able to pay up the said fund when required, which he had received from the estate of *Luke Tiernan, Esq.*, as aforesaid, he received the same without the knowledge of the said *John Glenn*, and also applied the same as before stated, without his knowledge. And this defendant further answering, saith, that he is aware that this answer is important in many particulars. That for eleven months he has been, from indisposition, rendered almost incapable of attending to business; and in consequence of ill health has been compelled to remove from *Baltimore*. That the copy of the petition in this cause was shewn to him on the 16th March last, past, but not left with him. That as soon thereafter as possible, he came to *Baltimore*, for the purpose of preparing his answer, but that from that time until yesterday, he has been confined by indisposition, and unable to answer the same. He therefore now prays for further time, and he will, &c.

The answer of *John Glenn* admitted, that on the 27th July 1836, *John Scott, Esq.*, and respondent, received for investment $10,695.48, of which was lent to *John H. Hunter*, on the following day, secured by mortgage, $5000; that this sum, with interest, was repaid on the last of July 1831, and on the following day, $5000 were loaned to *Luke Tiernan*, on mortgage. That the interest received of *Hunter*, was in part applied by *Mr. Scott*, for a fee due him of $500, in the Court of Appeals, and Court of chancery, in this cause. That this respondent never knew or supposed, till very recently, that said *Scott* had received of *Mr. Tiernan*, or his representatives, any part of either the principal or interest of said mortgage; and this respondent avers, that such receipt was without the authority, privity, consent, or knowledge, of this respondent. That in the month of August 1836, the said *Scott* and respondent, lent to *Alexander Brown & Sons*, $5856.34, from which deduct a fee paid to *Reverdy Johnson*, on or about 3rd September 1838, and the balance this respondent brings here into court, with this answer, and this respondent prays to have allowed to

him a commission for such investment, and also for $1350, paid out of said fund to *Jno. Scott, Esq.*, counsel of *Joseph* and *Alexander McKim*, with interest thereon, from the time the same was paid to him, and, &c.

Statement by *J. Glenn* filed, with his answer :—

| | | |
|---|---|---|
| 1836, Aug. 9—To cash lent *A. Brown & Co.*, | | $5866 34 |
| Int. to 30th June 1843, | | 2425 5S |
| | | $8291 92 |
| Deduct, | | |
| 3rd Sept., 1838—Paid *R. Johnson*, | $500 00 | |
| Int. to 30th June 1843, | 144 75 | 644 75 |
| | | $7647 17 |

The cause was then referred to the auditor, and the defendant, *Glenn*, deposited in court the balance above mentioned.

The auditor reported an account, in which he distributed the above sum among the heirs of *Samuel McKim*, a portion to the petitioners, with others, and he further reported, that an agreement was filed on the 3rd April 1837, for suspending over the payment of *Alexander McKim's* portion of the proceeds of sale, until the termination of a certain controversy therein mentioned, which does not appear, from the proceedings, to have been yet terminated; and that on the 17th September 1838, an order was passed, suspending the payment over of the net proceeds of the estate of the deceased, until further order, which has not yet been rescinded; and he submitted, that no part of the said fund in court be distributed, without further proceedings, and that the payment of the said *Alexander McKim's* portion thereof, be also suspended, according to the said agreement; and he further reports, that it appears from the answers of *John Scott* and *John Glenn, Esqs.*, the trustees, that the funds entrusted to them, for the purpose of investment, had been misapplied by the former; that the deficiency is evidently greater than any amount of fees that would be allowed, according to the usual course of the court, and the said trustees are answerable, each for the conduct of the other; no commissions have been for the present allowed.

The petitioners then filed another petition, suggesting the grounds on which the objections of the auditor, in reference to the suspending orders, might be dispensed with, and praying another reference to that officer, which was ordered on the 19th October 1843.

It was then admitted, by agreement, that *John Glenn* never united in any release of mortgage to *Luke Tiernan,* or his representatives, of the mortgage made to him and *John Scott.*

The auditor then filed another account, in which the two trustees were jointly charged with $10,695.48, as per their receipt of 30th July 1836, with $170.86 loaned, being so much above the amount entrusted to them by the answer of *John Glenn,* with various amounts of interest received, and credited with the sum of $7647.17, paid into court by *Glenn;* $500 paid to counsel, and commissions on the whole sum. The balance, $7232.75, was variously distributed among the heirs of *S. McKim;* a second account only distributed the money paid in by *Glenn.*

The appellant, *Glenn,* excepted to this audit, because it charged him with money received by *John Scott,* and with more money, $170,86, than was ever received to be invested; and because in one account, no commissions was allowed him.

It was then further admitted, that the property mortgaged by *Luke Tiernan* to *John Glenn* and *John Scott,* to secure the payment of the money belonging to the *McKim* estate, loaned by said *Glenn* and *Scott,* to said *Tiernan,* was amply sufficient for the purpose; that the moneys stated by *John Scott* to have been received by him, were so received by him in manner and under the circumstances stated in his answer, filed in this case, and that *John Glenn,* in no way, participated in receiving such money, or endorsing the note given for its security, or in releasing the mortgage; and it is agreed, that the last account stated and reported by the auditor, for the distribution of the money actually in court, shall be ratified, as stated.

The mortgage of the 1st August 1837, from *Luke Tiernan,* for $5000, to *Glenn* and *Scott,* as trustees, was also filed, with the release thereof, by *John Scott,* of the 2nd December 1841.

On the 3rd January 1844, other accounts were reported, in which the balance of $7232.75, was assumed to be still due from *Scott* to *Glenn*, and distributed differently from the former accounts, in consequence of the death of some of the heirs, and for other reasons.

To this account the appellant also filed exceptions; but on the 27th January 1844, the Chancellor, (BLAND,) ratified it, and ordered the trustees to pay accordingly; from which the said *Glenn* prosecuted this appeal.

The cause was argued before ARCHER, C J., CHAMBERS, SPENCE, MAGRUDER and MARTIN, J.

By MEREDITH for the appellant.

The exception of the appellant to the auditor's account, as to $170 charged against him, must prevail. The charge is a clear mistake.

There was no original liability of the trustees, each for the other. *Glenn* did not select *Scott*, who was the attorney of the parties. This is an additional ground of defence for the appellant.

That the trustees were not originally liable for each other; and that fraud, mal-practice, is the ground of such liability; he cited: *Townley vs. Sherbone, Bridgman's Rep.*, 35. *Lewin on Trusts*, 136. 24 *Law Lib.*, 136. *Sadler vs. Hobbs*, 2 *Bro. C. R.*, 116, 117. *Townley vs. Chalenor, Cro. Chas* , 312. *Hardres*, 314. *Leigh vs. Barry*, 3 *Atk*, 584. *Williams vs. Nixon*, 2 *Beavan*, 472. *Littlehales vs. Gascoyne*, 3 *Bro. C. R.*, 74. *Hovey vs. Blakeman*, 4 *Ves.*, 596. *Bacon vs. Bacon*, 5 *Ves.*, 331. *Evans vs. Evans*, 1 *Dessau*, 520. *Knox vs. Pickett*, 4 *Dessau*, 92. *Sutherlend vs. Brush*, 7 *John. C. R.*, 22. *Lawrence vs. Lawrence, Lit. Select Cases*, 23. *Massey vs. Carlton*, 1 *Cheves*, 181. 1 *Iredell Eq.*, 93. *Gardner and Bowling vs. Harvey and Simms*, 12 *G. & J.*, 365, 384. *Walker vs. Symonds*, 3 *Swan*, 1. *Lewin on Trusts*, 24 *Law Lib.*, 140. *Brice vs. Stokes*, 11 *Ves.*, 319. *Langford vs. Gascoyne*, 11 *Ves.*, 335.

Joint executors and joint trustees, are exempt from all liability for each other, if merely passive, though with knowledge that his co-executor or trustee, has the funds. *Williams vs. Nixon, 2 Beavan,* 472. Where two executors were directed to invest and accumulate a surplus, one received the funds and misapplied it, the other, without knowledge, is not answerable. *Lenoir vs. Winn, 4 Dessau,* 65.

The general rule is, that one trustee is not liable for the default of his companion, nor is it error on his part, to permit his co-trustee to receive the funds of the trust.

If a trustee is not merely passive, but by some positive act, by direction or agreement, enables his co-trustee to get possession of the trust fund, then he is liable. *Clough vs. Bond,* 3 *Mylne & Craig,* 490. *Davis vs. Spurling,* 1 *Russ. & Mylne,* 66. *Gill vs. The Attorney General, Hardres,* 314. *Shipbrook vs. Hinchinbrook,* 11 *Ves.,* 252. *Same case,* 16 *Ves.,* 477. *Fox vs. Mackreth,* 2 *Bro. C. R ,* 400. *Underwood vs. Stevens,* 1 *Merriv,* 712. *Adair vs. Shaw,* 1 *Sch. & Lef.,* 272. *Joy vs. Campbell, Ib.,* 341. *Bone vs. Cooke,* 13 *Price,* 332. *Chambers vs. Minchin,* 7 *Ves.,* 186. 3 *Young & Collyer,* 359. *Clarke vs. Clarke,* 8 *Paige,* 153. *Monell vs. Monell,* 5 *J. C. R.,* 283. *Johnson vs. Johnson,* 2 *Hill,* 293.

If one trustee joins in a receipt, but receives no part, and shows the fact, the receipt itself does not impose any liability on him. *Fellows vs. Mitchell and Owen,* 1 *P. Wms.,* 81. *Churchill vs. Lady Hobson,* 1 *P. Wms.,* 241, each trustee is to account for what he has received. A trustee may passively let funds go into the hands of a co-trustee, but in any agreement with him, he makes himself responsible. The principle which protects a trustee from responsibility, when he joined in a receipt, and in fact received no part, was not originally applied to executors, on the ground, that as it is not necessary for the executor to join, interfering in the transaction unnecessarily, the inference is the other way. If he assumes a power over the fund, he is answerable in the particular transaction. *Churchill vs. Lady Hobson,* 1 *P. Wms.,* 241. *Brice vs. Stokes,* 11 *Ves.,* 324. *Harden vs. Parsons,* 1 *Eden,* 147. *Westley*

vs. *Clarke*, 1 *Eden*, 359.    *Sadler vs. Hobbs*, 2 *Bro. C. R.*,
117.    *Chambers vs. Minchin*, 7 *Ves.*, 198.    *Shipbrook vs.
Hinchinbrook*, 16 *Ves.*, 479.    *Joy vs. Campbell*, 1 *Sch. &
Lef.*, 344.    *Mosely*, 35.    24 *Law Lib.*, 138.

The rule was attacked in 1 *P. Wms.*, 241, a distinction
was taken applicable to executors, in relation to legatees and
creditors.    The principle was applied in relation to creditors,
entitled to the utmost benefit of the law, against executors
joining in a receipt.    Each executor was made liable for the
whole, but as to legatees, they had no remedy for their demand,
but in equity.

In *Westley vs. Clarke*, 1 *Eden*, 245, the distinction between
executors and trustees was doubted, and held, they stood on
same ground with reference to receipts, if there is no other
proof, as where one executor received mortgage money, and
afterwards asked his co-executor to unite in a receipt and release.
The act of the second deemed nugatory, one executor is com-
petent to receive and release, and his acts are binding.    In
*Scurfield vs. Howes*, 3 *Bro. C. R.*, 94, Lord Alvanley
doubted the distinction.    In *Hovey vs. Blakeman*, 4 *Ves.*, 608,
joining in a receipt was not held conclusive.    There acting,
as well as joining in a receipt.    *Walker vs. Symonds*, 3 *Swan*,
64.    2 *Sto. Eq.*, sec. 1283.    Joining in a receipt, is only
*prima facie* evidence.    *Monell vs. Monell*, 5 *John. C. R.*, 296.
*McNair's Appeal*, 4 *Rawle. Rep.*, 148.    Many exceptions
have been introduced, but the true test is in *Townley vs. Sher-
bone*.    Trustees are sometimes treated as bailees, and only
responsible for negligence, evil practice, or fraud.    *Knight vs.
Earl of Plymouth*, 1 *Dicken*, 126.    *Sto. on Bail*, 111.    2
*Ch. Cases*, 2.    *Pybus vs. Smith*, 1 *Ves.*, Jr., 189.    Trustees,
who are mere stakeholders, not liable.    *Balchin vs. Scott*, 2
*Ves.*, 677.    It is like a gratuitous bailment.

The test of liability is this:—as a general rule, not bound
for the acts and doings of each other,—if there is an absence
of all fraud, and the exercise of reasonable diligence, no lia-
bility attaches.    *Clough vs. Bond*, 3 *Mylne & Craig*, 490,
496.    *Rowth vs. Howell*, 3 *Ves.*, 565.    *Bacon vs. Bacon*, 5
*Ves.*, 331.    Trustee dealt with funds as his own property, not

liable, *Adams vs. Claxton,* 6 *Ves.,* 225, 227. They are expected to take the same care of trust funds, as a reasonable attention to their own affairs would dictate to them, to take of their own property, and not more. *Massy vs. Banner,* 1 *Jaco. & Walk.,* 241. *Rainsfred vs. Rainsfred, Rice S. C. Eq. Rep.,* 343. *Hurtt vs. Fisher,* 1 *H. & G.,* 88. Trustees are responsible for gross negligence. *Mr. Glenn's* want of knowledge, now admitted by all, excuses him from *Mr. Scott's* default. Was there an exercise of due diligence on his part? He made no enquiry. He knew of the mortgage, that it was joint and ample; of *Mr. Scott's* relations to the parties in interest; that he was attorney, administrator for some; that he was *"dux et factotum,"* entitled to large fees for extended labor. He knew the mortgage could not be released without him; that the executors of *Tiernan,* were cautious and prudent men; that the transaction could not be attacked for fraud; that the application of a third party, kept the fund locked up. There was, then, no want of diligence in relying securely upon the mortgage.

It was a trust fund, the representatives of *Tiernan* had notice of this when they took the release. The petitioners ought to follow the property for their indemnity. *Lewin on Trust,* 135. *Sinclair vs. Jackson,* 8 *Cow.,* 543. *Hawley vs. James,* 5 *Paige,* 323. *Murray vs. Lylburn,* 2 *J. C. R.,* 442. *Adams vs. Clifton,* 1 *Russ.,* 297.

If the executors of *Tiernan* had been made parties, what defence could they have set up? The court would have sheltered an innocent trustee. Then, what is there to prevent the remanding of this cause, with directions to make new parties, and seek relief against the mortgaged property?

By LATROBE for the appellee.

In this cause, there was more than one trustee in fact, yet, all are regarded by the courts as one. This might lead in some cases to injustice, if not controlled, to some extent, by the salutary discretion of the courts of equity. A recipient of a fund is alone responsible, except under peculiar circumstances. 2 *Story Eq.,* 652, sec. 1283. We start in this cause

48     v.3

with a joint receipt. The responsibility is to be regulated by that instrument. It attached at the time when the two trustees received the money. *Monell vs. Monell,* 5 *John. C. R.,* 295. 2 *Sto. Eq.,* 649. *Joy vs. Campbell,* 1 *Sch. & Lef.,* 341. The true question is, was the fund under the control of both parties? if so, both are chargeable. *Bridgeman,* 35. 7 *East,* 240. 1 *Dev. & Batt.,* 199. No cases have been cited, where the joint trustee has been discharged by equity; yet, in most of the cases, that trustee had not, in fact, received the money sought to be recovered. The fund, once in the hands of the trustee, and he remains responsible, while the security is ample and solvent. The cases, *Churchill vs. Lady Hobson,* 1 *P. Wms.,* 241; *Williams vs. Nixon,* 2 *Beav.,* 472, are the only exceptions.

The fraud of one trustee is, constructively, the fraud of the other; that is, he is liable for consequences, though innocent of the fact. How can the fraud of one, discharge a liability which has attached? The duty here, was for both trustees to invest and return the money into court, upon a certain event, which has long since transpired. Of that duty to return, the co-trustee was negligent. He let it pass, and did nothing. He did not attempt to recall the fund. A prudent man would have looked after it. The expiration of the mortgage, the death of debtor, and the end of a year from that death, at which epoch the administrator of the deceased debtor was bound to pay, were all cautions calculated to excite attention and promote diligence, and yet the trustee did nothing. After this, the fund was lost by payment to his associate trustee, since dead and insolvent. 24 *Law Lib.,* 140.

By REVERDY JOHNSON for the appellant, in reply.

The mortgage taken by the two trustees was a good security, for principal and all accruing interest. The object of the agreement was, to increase the fund, and secure both parties beyond the mere personal security of the trustees. The fund was to be placed beyond the hazard of loss by investment. What is the law of such a case? what the extent of the responsibility of *each* trustee? The general rule is not denied.

In the case of joint trustees, whether they do, or do not join in the receipt, there is no responsibility for each other, except for misconduct; when one, who has *not in fact received* the fund, is called upon to account, that fact must appear. The rule is founded on two grounds: on a general equity, that a trustee is not bound to answer for what he has not received; on public policy, that a more rigid principle would be too severe, too exacting, and thus the public would suffer, by excluding prudent men from a service where they are most essential. The principles are stated in *Bridgeman*, 35. 24 *Law Lib.*, 269, 271. There must be fraud, evil dealing, or mal-practice in the *non-receiving* trustee. It is no breach of trust to permit one of two trustees, to receive *all the profits* of an investment. *Ex parte Belchor vs. Parsons, Ambler*, 219. *Fellows vs. Mitchell*, 1 *P. Wms.*, 83. 2 *Sto. Eq.*, 1280, 1281. It was the opinion of that distinguished jurist, *Judge Storey*, that a joint trustee was only liable for his own acts and receipts; perhaps he was in error, as to difference in the rule touching executors and trustees in *England*.

The rule of irresponsibility, in favor of innocent trustees, is founded in justice. He ought never to suffer where he could not, ought not, to anticipate loss, and prevent loss. Any other doctrine would be against equity. Why does a joint receipt impose liability on all? Because all are blameable for some act done, or omitted to be done, under it. It supposes, that loss could not incur, unless blame on all. Possession of funds at sometime, during and under a trust, does not involve responsibility at all future time, while the trust continues. The fund was received in 1836; loaned by *both* to *Hunter*, on good security, and repaid The whole principal was lent again to *Tiernan*, fairly, honestly and prudently. If the second loan had been refused, it would have been a *breach of duty*. Some calamity arises. The property depreciates in value. The trustees are not responsible for loss, yet, they received, and have not accounted. How are they to account? What they did, was in the course of duty, and it would be flagrant wrong to make them responsible for such a loss. The test is, what would a man of ordinary prudence and care, have done under the cir-

cumstances? The object was to make interest, the principal being well secured; the fund could not be used, by reason of intervening proceedings in chancery; it was locked up. In such a case, all prudent men would have awaited, until the court could act. But, for what he did not know, and, therefore, could not prevent, he was doing what the object, design, and intent of his appointment demanded.

The court will treat a faithful trustee, as liberally as they can.

The cases in *Ringgold vs. Ringgold*, 1 *Harr. & Gill*, 11. *Gardner and Bowling vs. Hardey and Simms*, 12 *Gill & John.*, 384. 1 *P. Wms.*, 241. *Bacon vs. Bacon*, 5 *Ves.*, 331, are all important causes on these questions, and this head of equity.

The item of $1350, was received by *Scott*, as counsel for *Joseph* and *Alexander McKim*, and this discharges *Glenn*. The $200 was borrowed by *Scott*, to whom fees were due out of the fund.

Compound interest will not be allowed, there was no direction to accumulate by re-investment.

MAGRUDER, J., delivered the opinion of this court.

A decree of the Court of chancery, brought into that court a large sum of money, the proceeds of sale of the real estate of *Samuel McKim*, in order there to be distributed among the persons to whom the real estate descended. Before distribution was made, the title of some of the claimants to any share of the estate, and, of course, of the purchase money, was denied by others, who were admitted to be heirs of the intestate. Thus arose a controversy in chancery, about a considerable part of the fund, and the Chancellor having, by his order, excluded some of the claimants, an appeal was taken by them to the Court of Appeals. Shortly after this appeal, the parties litigant, by their counsel, entered into an agreement, (which it is admitted, had the sanction of the Chancellor,) "that *John Scott* and *John Glenn*, be constituted trustees, to receive and to invest that portion of the fund which was in controversy;" that a check, payable to their order, be drawn by the proper officer, and that "upon the final hearing of the said appeal,

the said *John Glenn* and *John Scott*, shall pay into the Court of chancery, the said sum of money, and all interest and profit which may accrue thereon, subject to the said order and decree, which may be passed on said appeal.''

In pursuance of this arrangement, *Scott* and *Glenn*, on the 27th July 1836, received the money, and the manner in which they disposed of it, is fully set forth in the proceeding. It has never been alleged, that they did not invest it judiciously, and within a reasonable time.

At June term 1838, the Chancellor's order was affirmed by the Court of Appeals. No application, however, was made to the Chancellor, in regard to the distribution of this fund, by those to whom his order, (affirmed by the Court of Appeals,) gave it, until March 1843, when a petition was filed, by persons having an interest in the fund, requiring the trustees to account for the same. Thereupon, each of the trustees filed an answer, and by these answers it appeared, that *Scott* had misapplied a part of the fund; but, that with respect to *Glenn*, a payment, which he made into court, in compliance with the order, discharged him, unless he could be made responsible for the default of his co-trustee And, whether *Glenn*, the plaintiff in error, is responsible for such default of his co-trustee, is the principal enquiry upon this appeal?

The uncontroverted facts in this case, furnish all the answer that need to be given to very many of the authorities, on which reliance seems to have been placed. We need not remark upon the cases which instruct us, that a trustee is answerable for the default of his co-trustee, if, with a knowledge that the trust fund is in a course of abuse, that his co-trustee is making an improper use of it, he remains passive, refuses or declines to interfere. The case before us, is not one of that character. We need not notice the adjudications, which tell us, that if there be some mal-practice, fraud or evil dealing, then the one shall be answerable for the default of the other. To any of these, or such like cases, we have no occasion to refer, because, in the case before us, the trustee, whom it is attempted to make responsible for the default of his co-trustee, is nowhere charged with anything like fraud or collusion, or culpable omission of

duty. *Glenn* denies, upon oath, all knowledge of the receipt by *Scott;* of the money, afterwards wasted, and there is no statement or allegation, or intimation, from which it can be inferred, that he knew, or had any reason to suspect, that his co-trustee had abused, or was capable of abusing the trust reposed in him, and reposed in him, too, by the parties to whom the trust fund belonged, and most, if not all of whom, had confided their interests to him, as their solicitor.

The Chancellor, as a reason for making *Glenn* answerable, observes, that *Glenn* and *Scott* were, by the act of the court, founded on the agreement of the parties, judicially constituted joint trustees, and as such, jointly liable for the whole amount of the money so committed to their disposition.

It is apprehended, that whether this be considered a judicial appointment, or one made by the parties themselves, there is nothing in the case, or in the circumstances connected with this trust, which would authorise us to say, that *Glenn* was answerable for the default of *Scott.* Security might have been required of these trustees. It might have been insisted, that before the money was placed in their hands, they should give a joint bond with security, and thereby become security, each for the other; or, several bonds, the bond of each to be liable for the misconduct of the principal obligee in it. But, no bond at all was required by those who could have required it, and, surely, it does not follow, that each is answerable for the fidelity of the other, because, those who might have exacted security, think proper to dispense with it.

It is not perceived, that the case would be essentially different, if this was, strictly speaking, a judicial appointment; but, the order of the Chancellor, is in execution of the agreement of the parties, naming to him the persons who are to be entrusted with their funds. *Scott* was not selected by *Glenn* as his associate. In him, the parties who owned the fund, chose to repose confidence, and agreed to dispense, with security, for his good conduct. In the case of *Townley against Chalenor*, as reported in *Cro. Charles*, 312, it was resolved, that *Townley*, being but a party entrusted, shall not be answerable for more than came to his hands, and the reason assigned for this

resolution, was, "it was the default of him, who put them in trust, to repose trust in one who was unable to pay, and he being the party trusted, as well as *Townley, Townley* shall not be compellable to satisfy his defect." We have a more full report of the same case, (though the name of defendant is different,) in *Bridgeman's Reports.* There we are told, that in order to charge one trustee, for the defaults and deficiencies of their co-trustees, there must be proof, or circumstances to satisfy the court, that there had been *dolus malus*, or evil practice, fraud, or evil intent in him. It is true, indeed, as the lord keeper observed, that care should be taken, that trustees be not emboldened to break the trust imposed on them. It must be equally true, that parties trusted, ought not to be too much punished, lest it should dishearten men to take any trust, and all would be deterred from undertaking any trust; those only excepted, whose ignorance or knavery, render them unworthy of trust. *Scott*, the defaulter, was the trustee of the parties interested, chosen by them, and not by his co-trustee.

If we look at the circumstances connected with this trust, there is nothing to be found in them, which can operate at all to the prejudice of the plaintiff in error. *Scott* was a solicitor in the Court of chancery, and had the conduct of the original suit. He appeared in chancery and the Court of Appeals, for the successful parties, with power, it would seem, to secure such professional assistance as he might deem necessary; he was the agent of several, administered upon the estate of one of the owners of the fund, and had the orders of some of them, to receive the money to which they were entitled. It would be difficult, indeed, to prove, that if *Scott* had brought into court, all the money which he received, and there had been an order for the distribution of the fund, he had not undoubted power, to receive a larger portion of the fund than he wasted; that the solicitor and agent of the parties interested, could not have claimed more than is due from him, as trustee. Why, in such a case, should the plaintiff in error, be dealt with more severely than the trustee, was, in the very many cases, to be found in the authorities, wherein, the attempt to make one trustee or executor, answer for the default of the other, was unsuccessful?

In this case, the petition, let it be remembered, does not charge the plaintiff in error with fraud, collusion, or criminal remissness, and the parties to that petition, by submitting the case upon petition and answer, put it out of the power of the plaintiff, in this court, to deny or refute any specific charge. The question, in truth, is, whether there be in the answer itself, any admission or statement, which will authorise a Court of chancery, to make him responsible for any portion of the trust fund, admitted by his co-trustee to have been received by him, and for which he does not deny, that he is exclusively answerable?

The petitioners set forth their claim in these words: "But they are advised, that the said trustees are jointly accountable to them, as well for what they have actually made, by the employment of said funds, as also for what they might have made, but for any negligence or default committed by them, or either of them."

It would seem, that as the money, when received, and almost as soon as received, was judiciously invested, nothing more need to be said in regard to the claim, as stated by the petitioners themselves.

In the course of the argument, however, we have been referred to the receipt given to the register of the Court of chancery, which is proof positive, that the whole fund was, at the date of the receipt, in the hands of the plaintiff in error, and, therefore, it is contended, that he must be answerable for the whole. The argument would be entitled to much weight, and the authorities cited would be in point, if, after receiving the money, the plaintiff in error, had put it into the hands of his co-trustee, to make the investment, and instead of investing it, the co-trustee had applied it to his own uses. No doubt, the plaintiff in error, is bound to account for the money he received from the register, and he does give the most satisfactory account of it. He invested it, as he was bound to do. He parted with it, because it was his duty to part with it, and the case now is, precisely what it would have been, if the register had been directed not to pay the money to either of the trustees, but to the persons to whom it was loaned, upon such persons securing,

by mortgage, its repayment to the trustees. If the enquiry was, what the trustees did with the money, which was taken out of the Court of chancery, it is easily answered, and both of the trustees would be found to be blameless. The case before us, would not be different, if only one, and either of the trustees, had been allowed by the court to receive and invest the money. The money in controversy, was money due from *Tiernan*, the payment of which was secured by a mortgage, executed to the two trustees. Thus far, undeniably, the plaintiff in error, was not responsible for any part of it. But *Scott*, in the course of time, received and misapplied it. Of the receipt of it, the plaintiff in error, swears, (and it is not controverted,) that he was entirely ignorant. He did no act whatever, by which his co-trustee got the money, and left undone 'no act, which, if done, would have prevented the co-trustee from receiving it. Surely, if in such a case, the innocent trustee is to to be made answerable, it would be unreasonable to expect, that any prudent person could be prevailed upon to become one of two or more trustees.

It has been said, however, that by the terms of the loan, the money was due, and ought to have been collected; and, moreover, the appeal had been decided, and for that reason, the plaintiff in error, ought to have been prepared to pay it into chancery. There would be some plausibility in this, but for a fact which the record discloses, and which has not yet been noticed. The Chancellor, at the instance of a person, who claimed to be a creditor of the deceased, (*S. McKim*,) and for whose claim, if established, the land might be responsible, had passed an order, directing the trustees to retain the fund. How retain it? To be sure, they received the money, to invest it, *pendente lite*, between the real and pretended heirs, and the strict letter of the agreement, which placed the money in their hands, did seem to require, that they should be ready to bring it into chancery, upon the determination of that appeal. But, what was the obvious meaning of the agreement, upon which all parties acted? The money was to be invested, not to lie idle and unemployed in chancery, until chancery could distribute it. The appeal pending in the higher court, was spoken

49    v.3

of, because, at the time, it was the only obstacle to the distribution of the fund. It was not the duty or the right of the trustees, to prevent the money from yielding interest, while the court had not, from any cause whatever, the power of distributing it. The order of the Chancellor, passed at the instance of an alleged creditor of *Samuel McKim,* put it out of the power of that court to distribute it; and the obvious intent of the parties required, that the investment, for the sake of interest, should continue, until that order was revoked. After the petition was filed, and the answers were put in by the trustees, the auditor reported to the Chancellor, that the fund could not yet be distributed, because of the last order of the Chancellor. We thus ascertain, that up to the date of *Glenn's* answer, the money was, properly, bearing interest.

If there was any want of due diligence, in procuring a revocation of the order, who is to bear the blame of it? Surely not *Glenn.* With the creditor's suit, he had no concern, and over it could exercise no control. It may be, that the petitioners, themselves, who must have been parties to that suit, might have procured its revocation at an earlier period, and might have prevented a delay in the settlement of this trust, until the defaulting trustee was no longer able to bring into court, the trust money, which he had received.

It has been said, (and in many cases of trust, it should be remembered,) that co-trustees are bound to watch the conduct of each other; and in a former case in this court, it was stated to be the received doctrine, that if the trustee, "who wasted the estate, was in any degree facilitated therein, by the acts and omissions of the other, they are both equally liable." This doctrine, however, cannot prejudice the plaintiff in error. He, certainly, neither did, nor omitted to do anything, by which his co-trustee was, "in any degree, facilitated in wasting the estate." But, may there not have been, in the conduct of the defendants in error, something of which the plaintiff in error, may justly complain? May he not claim the benefit of the maxim, *vigilantibus non dormientibus leges subserviunt?* So far as we can judge, it was owing to them entirely, owing to their remissness, in procuring a revocation of the Chancellor's

order, before spoken of; that the default of *Scott* remained a secret, until he became insolvent, and it may be until his death, gives to others a right to claim the portion of the fund to which he was entitled, as administrator of one of the claimants, if in no other character. Add to this, the statement in *Scott's* answer, relative to the fees, which were justly due to him, for his services in these suits, and it must be believed, that while the plaintiff in error, has possibly been injured, it is by no means clear, that the defendants in error, or some of them, will not profit by *sleeping upon their rights*.

The money was lent to *Tiernan*, it is said, upon a short credit, and ought, when it became due, to have been collected by plaintiff in error. To this an answer may be given in a few words : The credit was necessarily for a short period, because, in a short time, the Chancery court might have been, and it was supposed would have been, able to distribute the fund. But the money was to be invested, and to bear interest, until it could be distributed, and it was an advantage to all parties, that another investment should not be necessary. The debtor might insist on paying the debt, and if he had, the trustees would have been bound to receive it, *and again invest it*. If therefore the debtor did not offer to pay it to the trustee, there was no want of due diligence, in his forbearing to ask for payment.

We do not think that the plaintiff in error, ought to be charged with the money, which his co-trustee received from *Tiernan*, and his representatives.

Other questions were argued in connection with this, in which persons, not parties to this suit, are interested. Upon these we cannot intimate an opinion. We can only say, that the plaintiff in error, is not responsible for the money in dispute; of course he is not chargeable with interest on it.

With respect to the sum of $170.86, paid into chancery by the plaintiff in error, over and above the sum with which he was chargeable, the court can perceive no reason for refusing to return it. It cannot be retained on the assumption, that it had been received "on some investment *not specified.*" This also is error.

The sum allowed to *R. Johnson, Esq.*, has not been objected to, and of course must be allowed, without interest.

With respect to the credit of $300, which is claimed as so much paid to *Scott* for professional services, and also the credit of $1350, which is claimed, it does not appear to this court that the plaintiff in error had authority to pay them out of the trust fund, or that he can claim a credit for them in the settlement of his account as trustee. The commission allowed to this trustee is correct.

The order of the Chancellor, dated 26th January 1842, will be reversed, with costs, and the case to be remanded to chancery, in order that the account of *John Glenn*, as trustee, may be stated as herein directed, and that such further order be taken in the case as any of the parties interested may apply for.

DECREE REVERSED AND CAUSE REMANDED.